## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JONES WALKER LLP, | CIVIL ACTION NO. 14-01203 |
| Plaintiff, | SECTION J |
| VERSUS | JUDGE CARL BARBIER |
| PETAQUILLA MINERALS LTD. | MAG. JUDGE SALLY SHUSHAN |
| Defendant. | |

### JONES WALKER'S OPPOSITION TO PETAQUILLA'S
### MOTION TO STAY PENDING ARBITRATION

**NOW INTO COURT,** through undersigned counsel, comes Plaintiff, Jones Walker LLP ("Jones Walker" or "Plaintiff"), which files this opposition to the *Motion to Stay Pending Arbitration* (Dkt. No. 34) (the "Motion to Stay") filed by Defendant, Petaquilla Minerals Ltd. ("Petaquilla" or "Defendant").

## I.    INTRODUCTION

This lawsuit arises out of Petaquilla's engagement of Jones Walker to represent it in a complicated transaction and Petaquilla's subsequent evasive tactics to avoid paying Jones Walker's invoices for the services it provided to Petaquilla. Now, in what is simply another attempt[1] to avoid paying its legal fees, Petaquilla has filed a Motion to Stay pending a separate arbitration proceeding.  Specifically, Petaquilla asserts that as a signatory to an arbitration agreement with Global Hunter Securities, LLC ("Global Hunter"), it is subject to an arbitration

---

[1] Petaquilla has attempted to keep this proceeding from moving forward through various delay tactics.  First, Petaquilla failed to answer Jones Walker's complaint until Jones Walker almost obtained a default judgment against Petaquilla (Rec. Doc. 11,19).  Second, Petaquilla waited until the deadline to file a motion to dismiss based on lack of personal jurisdiction and refused to engage in any discovery until the motion was decided.  Third, Petaquilla waited until Jones Walker filed a Motion to Compel before submitting some of its discovery (Rec. Doc. 37).

demand by Global Hunter over its failure to pay Global Hunter's fees.  Petaquilla further claims that this arbitration demand entitles it to a mandatory stay and, in the alternative, a discretionary stay over the instant litigation.  The narrow issue before the Court is whether the Court should stay the instant litigation pending an arbitration between Global Hunter and Petaquilla, even though Jones Walker was not a party to the arbitration agreement.  Under the established jurisprudence in this area, Petaquilla is not entitled to a mandatory stay in this proceeding pursuant to the Federal Arbitration Act (the "FAA") because Jones Walker was not a party to the arbitration agreement.  Additionally, Petaquilla is  not entitled to a mandatory or discretionary stay because it has failed to show that: (i) the issues involved in the arbitration between Petaquilla and Global Hunter are wholly inseparable from the facts and issues before this Court, and; (ii) that this litigation would have a critical impact on Petaquilla's arbitration with Global Hunter.  Thus, the Motion to Stay is simply Petaquilla's latest attempt to delay these proceedings and avoid paying its attorney's fees.  Accordingly, for the reasons set forth more fully below, the Court should deny the Motion to Stay.

## II.    BACKGROUND

### A.    The Engagement Letter Between Petaquilla and Global Hunter and its Arbitration Clause.

On March 2, 2012, Petaquilla engaged Global Hunter as its non-exclusive advisor and placement agent in connection with a multi-million dollar high-yield debt bond offering (the "Transaction") by executing that certain engagement letter (the "Engagement Letter").[2]  The

---

[2] While the affidavits cited by Jones Walker in this case were originally attached to its Motion to Dismiss, the statements made in those affidavits are relevant to this issue as well.  The affidavit of John Marshall Page, III of Jones Walker (the "Page Affidavit") is attached hereto as **Exhibit 1**.  The affidavit of Gary Meringer, general counsel of Global Hunter (the "Meringer Affidavit"), is attached hereto as **Exhibit 2**.  Please see Meringer Affidavit, at ¶ 3; and the Engagement Letter which is attached to the Meringer Affidavit as Exhibit 2-A.

Engagement Letter defined the contractual relationship between Global Hunter and Petaquilla, including the, duties to be performed by the parties and Petaquilla's need to hire its own legal counsel.   The Engagement Letter also contained an arbitration clause.   Global Hunter has invoked the arbitration clause to demand payment for its fees under the Transaction.[3]

### 1.   The Engagement Letter Establishes that Petaquilla was to Hire its Own Legal Counsel.

Pursuant to Section 1 of the Engagement Letter, "Scope of the Engagement," Global Hunter was to, among other things, "*assist* in the drafting, preparation, and distribution of an offering document (the "Offering Document") and other related documentation"[4] (emphasis added).  Global Hunter was also to "advise the Company [Petaquilla] regarding the participation of additional entities and/or persons in the Placement; no entity or person, including co-underwriters, co-placement agents, co-initial purchasers and/or co-arrangers will participate in the Placement in any capacity without the consent of GHS which shall not be unreasonably withheld."[5]

To assist it with its duties as placement agent, Global Hunter engaged Proskauer Rose LLP ("Proskauer") to act as its legal counsel in the Transaction.[6]  In fact, section three of the Engagement Letter provides that "the fees and expenses of GHS' [Global Hunter's] U.S. counsel, up to a limit of $600,000 shall be billed directly to and paid directly by [Petaquilla]."[7]

---

[3]See Petaquilla's Motion to Stay at Rec. Doc. 34-2.

[4] Meringer Affidavit, Exhibit 2-A.

[5] Meringer Affidavit, Exhibit 2-A.

[6] Meringer Affidavit, ¶ 4.

[7] Meringer Affidavit, ¶ 6; Exhibit 2-A.

This section refers to the attorney's fees of Proskauer as Global Hunter's U.S. counsel.[8] Significantly, the Engagement Letter establishes that Petaquilla must hire its own legal counsel to advise it during the Transaction. Section 6 of the Engagement Letter entitled "Certain Acknowledgements" provides in pertinent part:

> The Company [Petaquilla] acknowledges that it is **not relying on the advice of GHS for tax, legal or accounting matters, it is seeking and will rely on the advice of its own professionals** and advisors for such matters and it will make an independent analysis and decision regarding the Placement based upon such advice.[9]

Moreover, pursuant to Section 6 of the Engagement Letter, Global Hunter was an independent contractor and did not have a fiduciary relationship with Petaquilla.[10]   Accordingly, Petaquilla agreed to, and acknowledged that, it would, among other things, (i) hire its own attorneys to represent it in the Transaction; (ii) not rely on the advice of Global Hunter or its legal counsel for legal matters; and (iii) not rely on Global Hunter as a fiduciary during the Transaction. Petaquilla complied with Section 6 of the Engagement Letter by hiring Jones Walker to act as its counsel.

### 2.    The Arbitration Clause Between Petaquilla and Global Hunter.

The Engagement Letter also contains an arbitration clause.   Section 11, entitled "Miscellaneous," provides that any dispute between Petaquilla and Global Hunter will be "settled by mandatory, confidential, binding arbitration before a single arbitrator in New York City in accordance with the American Arbitration Association ("AAA") Commercial Arbitration

---

[8] Meringer Affidavit, ¶ 6; Exhibit 2-A.

[9] Meringer Affidavit, Exhibit 2-A.

[10] Meringer Affidavit, ¶ 3.

Rules then in effect."[11]  Jones Walker was not a signatory to the Engagement Letter and did not

agree to arbitrate its disputes with Global Hunter or Petaquilla.  In fact, the Engagement Letter

was signed before Jones Walker was engaged by Petaquilla.  Accordingly, Jones Walker is not a

party to, nor bound by, the agreement to arbitrate contained in the Engagement Letter.

### 3. Global Hunter's Demand For Arbitration Does Not Involve Jones Walker.

On March 5, 2015, Global Hunter issued a "Demand for Arbitration" to Petaquilla

pursuant to the arbitration clause contained in the Engagement Letter.[12]  Global Hunter stated in

its Demand for Arbitration that the dispute centers around the reimbursable incurred expenses

pursuant to the Engagement Letter that are owed to it by Petaquilla in the amount of

$1,198,346.76 and $73,34785.[13]  Specifically, the synopsis of the dispute, provides as follows:

> On or about March 2, 2012, Global Hunter and Petaquilla entered
> into an engagement agreement ("EA"), whereby GHS agreed to act
> as the non-exclusive advisor and exclusive placement agent for
> PTQ in connection with a proposed placement of $150 million of
> PTQ's high-yield debt instruments.  EA provided GHS to be
> compensated for services rendered in accordance with an agreed
> upon formula prescribed by EA; reasonable out-of-pocket
> expenses incurred in connection with the performance of its
> engagement including without limitation the fees, disbursements,
> and other charges of GHS' counsel.  EA provided that this
> compensation not be contingent on outcome of any transaction
> under the EA.  GHS has repeatedly requested that PTQ pay the
> reimbursable incurred expenses under the EA.  PTQ has neglected
> to pay GHS the monies owed.[14]

---

[11] Meringer Affidavit, Exhibit 2-A.

[12] See Petaquilla's Motion to Stay at Rec. Doc. 34-2.

[13] See Petaquilla's Motion to Stay at Rec. Doc. 34-2.

[14] See Petaquilla's Motion to Stay at Rec. Doc. 34-2.

Based on the foregoing synopsis, the arbitration proceeding is based on whether Global Hunter is entitled to be reimbursed by Petaquilla for its reasonable fees and expenses, as provided by the Engagement Letter.  Included in its Demand for Arbitration, Global Hunter is seeking its costs and attorneys' fees for the work Proskauer performed in connection with the Transaction.  Global Hunter has attested that it hired Proskauer to act as its counsel in the Transaction and that it did not hire Jones Walker to represent it or Petaquilla in the Transaction.[15] Rather, Jones Walker was  hired directly by Petaquilla to act as its counsel.  Accordingly, the arbitration proceeding is separate and apart from what is before this Court.

4.     **The Issues Before the Court Involve the Fees Owed to Jones Walker by Petaquilla for the Work Jones Walker Completed for the Transaction.**

On or about March 1, 2012, Gary Meringer, General Counsel for Global Hunter, contacted John Marshall Page, III, a partner at Jones Walker to discuss the possibility of Jones Walker acting as U.S. counsel for Petaquilla, in connection with the Transaction.[16]  During that conversation, Mr. Meringer informed Mr. Page that Petaquilla had engaged Global Hunter as its non-exclusive advisor and placement agent in the Transaction.[17]  Further, Mr. Meringer informed Mr. Page that Global Hunter had engaged Proskauer to act as Global Hunter's legal counsel in the Transaction.[18]

Thereafter, between March 1, 2012 and March 6, 2012, Joseph Parkey, a partner at Jones Walker, and Jones Walker associate Britton Seal, engaged in telephone calls with Richard Fifer,

---

[15] Meringer Affidavit, ¶¶ 4-5.

[16] Page Affidavit, ¶ 3.

[17] Page Affidavit, ¶ 3.

[18] Page Affidavit, ¶ 3.

Petaquilla's Chairman of the Board; Joao Manuel, Petaquilla's Chief Executive Officer; and Dimitri Zolotov, Petaquilla's Advisory Board Member, to discuss Jones Walker representing Petaquilla in the Transaction.[19]  After a March 6, 2012 phone call, Mr. Parkey sent an email to Mr. Fifer, Mr. Manuel, and Mr. Zolotov confirming that Jones Walker had been engaged by Petaquilla to act as its counsel in the Transaction. A few days later, Lucas T. Charleston, an associate at Proskauer, sent an e-mail dated March 10, 2012 to a large group of people including Mr. Fifer, Mr. Manuel and others at Petaquilla, which said in part "Jones Walker will be serving as the Company's [Petaquilla's] US counsel and Proskauer Rose LLP will be serving as underwriter's [Global Hunter's] US counsel . . . ."[20]  At no time during the Transaction did Mr. Fifer, Mr. Manuel, Mr. Zolotov, or any other representative of Petaquilla reject, refute, or deny the contents of Mr. Parkey's email.[21]

On March 7, 2012, Jones Walker's attorneys met with Raul Ferrer, a member of Petaquilla's board of directors, who had traveled to New Orleans.[22]  During that trip, Petaquilla requested that Mr. Ferrer meet in person with the Jones Walker lawyers who would be working

---

[19] Page Affidavit, ¶ 4.

[20] Page Affidavit, ¶¶ 5, 15; see also email correspondence with Mr. Parkey and employees of Petaquilla which is attached to the Page Affidavit as Exhibit 1-A; the Senior Secured Notes Offering Organizational Meeting document which identifies Jones Walker as Petaquilla's counsel, which is attached to the Page Affidavit as Exhibit 1-B and email correspondence between employees of Proskauer, Jones Walker and Petaquilla which identifies Jones Walker as Petaquilla's counsel, which is attached to the Page Affidavit as Exhibit 1-C.

[21] Page Affidavit, ¶ 7; Meringer Affidavit, ¶ 10.

[22] Page Affidavit, ¶ 6.

with Petaquilla throughout the Transaction.[23]  During the meeting, Jones Walker's attorneys  and

Mr. Ferrer discussed confidential information related to the details of the Transaction.[24]

### 5. The High-Yield Debt Transaction.

Jones Walker was engaged by Petaquilla to provide legal services in negotiating, drafting,

and advising Petaquilla in connection with a multi-million dollar high-yield debt bond offering

on behalf of Petaquilla.[25]  High yield bond transactions typically involve the issuer of the bonds

(Petaquilla in this case), and a number of outside advisors, including (i) outside legal counsel for

the issuer (Jones Walker), (ii) an investment bank to serve as the underwriter or placement agent

in the transaction (Global Hunter), (iii) counsel for the placement agent or underwriter

(Proskauer), (iv) an independent auditing firm, and (v) a trustee or paying agent. Under the

transaction at issue in this matter, the following roles/duties were executed as follows:

- Global Hunter, as the placement agent was responsible for marketing the bonds to

  investors and setting the price at which the securities would be offered.  To

  properly market the bonds Global Hunter had to do due diligence and sign off on

---

[23] Page Affidavit, ¶ 6.

[24] Page Affidavit, ¶ 6.

[25] As background, a high yield debt bond offering is a way for a company to raise money by selling interest-bearing bonds to investors.  The interest rate that investors will pay for a bond depends on the credit rating of the bonds.  Investors typically will request a higher interest rate to purchase bonds with a lower rating.  The term "high yield" refers to the interest rate.  Investors who purchase these bonds can expect a higher return, or yield, on their investment.  The bond that is sold in a high yield bond transaction is a "security" as determined by the Securities and Exchange Commission (the "SEC"), and the purchase and sale of securities is a highly regulated process.  Many high yield bond transactions, including the one at issue here, are conducted under a specialized area of law known as Rule 144A of the Securities Act of 1933, which allows private companies to sell bonds to large, sophisticated institutional buyers through a placement agent without registering the bonds with the SEC.

parts of the Offering Memorandum and offering documents to ensure it did not mis-lead its investors.

- Proskauer, counsel for Global Hunter as placement agent, led the legal due diligence effort during the offering process and worked with the issuer (Petaquilla) and its counsel (Jones Walker) to ensure the accuracy of the offering documents. Proskauer also was charged with negotiating the purchase agreement and other transaction documents on behalf of Global Hunter.

- Jones Walker, as issuer's counsel to Petaquilla, was responsible for overseeing the preparation of the offering documents and ensuring that Petaquilla complied with the complex securities laws involved in the offering. Further, Jones Walker as issuer's counsel, also negotiated a purchase agreement with Global Hunter, the placement agent and its counsel, Proskauer, and other transaction documents on behalf of and at Petaquilla's direction.

Given the complex and intricate nature of the high yield debt offering, as described above, Petaquilla had to hire its own U.S. Counsel to negotiate for and advise it during the Transaction. Global Hunter could not hire Jones Walker to act on Petaquilla's behalf as that would be a conflict of interest. To this end, it is preposterous and beyond belief for Petaquilla to suggest that it was not represented by counsel in the Transaction.

**6.     Jones Walker's Representation of Petaquilla in Connection With the Transaction.**

From March 2012 through February 2013 representatives of Petaquilla, including Richard Fifer and Joao Manuel, were in constant communication with attorneys at Jones Walker to complete all the work necessary for the Transaction. During this time period, representatives

of Petaquilla initiated and sent attorneys at Jones Walker 682 emails.[26]  Overall, Jones Walker

and Petaquilla exchanged a total of 1,031 emails in connection with the Transaction.[27]  In total,

attorneys at Jones Walker spent over 1,550 hours working on the Transaction, including

reviewing thousands of pages of Petaquilla's confidential financial information, conducting due

diligence, engaging in multiple office conferences, and drafting, revising, and finalizing offering

memoranda.[28]  In addition, Jones Walker participated in at least 43 telephone calls with

representatives of Petaquilla and over 30 telephone conference calls with Petaquilla, Global

Hunter, Proskauer, and Blakes, Cassels & Graydon LLP ("Blakes")[29], Petaquilla's Canadian

counsel, to discuss ongoing details and drafts of documents relating to the Transaction.[30]

Moreover, during Jones Walker's representation of Petaquilla, representatives of Petaquilla

travelled to New Orleans to work on the Transaction's Offering Memorandum.[31]  On May 19,

2012 and on May 20, 2012, Joao Manuel, Ezequiel Sirotinsky, and Andrew Ramcharan of

---

[26] Page Affidavit, ¶ 8.

[27] Page Affidavit, ¶ 9.

[28] Page Affidavit, ¶ 12.

[29] Like Jones Walker, Blakes is also suing Petaquilla for unpaid legal fees.  Blakes filed a lawsuit in Canada seeking over 1.2 million dollars in outstanding legal fees that it claims it is owed by Petaquilla.  This further demonstrates that Petaquilla has a pattern and practice of not paying its attorneys' fees. *See* Nelson Bennett, *Local Law Firm Hits Junior Miner with $1 Million Lawsuit Petaquilla Minerals Facing a Literary of Financial Woes,* (March 24, 2015, 12:34 p.m.), https://www.biv.com/article/2015/3/local-law-firm-hits-junior-miner-1-million-lawsuit/.

[30] Page Affidavit, ¶ 10, 11.

[31] Page Affidavit, ¶ 16; Meringer Affidavit, ¶ 12.

Petaquilla met with Jones Walker attorneys Britton Seal, Joe Parkey, and Raechelle Munna along with representatives of Global Hunter and Proskauer to work on the Transaction.[32]

### 7.   Petaquilla Identified and Relied on Jones Walker as its U.S. Counsel During the Transaction.

Throughout the Transaction, Jones Walker was identified as counsel for Petaquilla in numerous documents which were distributed to the parties working on the Transaction and the general public.[33]   At no time did Petaquilla ever indicate that Jones Walker was not engaged to act as its U.S. counsel in the Transaction.[34]   For example, on March 2, 2012, the document entitled, "Project Canal $150,000,000 Senior Secured Notes Offering Organizational Meeting" (the "Meeting Agenda"), was distributed in advance of the organizational meeting and telephone call for the Transaction (to be conducted March 5, 2012) by Global Hunter to individuals at Petaquilla, Jones Walker, Blakes and Proskauer.[35]   The Meeting Agenda was sent to Petaquilla's representatives including, Richard Fifer, Petaquilla's Chairman of the Board; Joao Manuel, Petaquilla's Chief Executive Officer; Rodrigo Esquivel, Petaquilla's President; Ezequiel Sirontinsky, Petaquilla's Chief Financial Officer; Dimitri Zolotov, Petaquilla's Advisory Board Member; and David Kaplan, another Advisory Board Member.[36]   Page 18 of the Meeting Agenda identifies Jones Walker as counsel for Petaquilla and Proskauer as counsel for Global

---

[32] Page Affidavit, ¶ 16; Meringer Affidavit, ¶ 12.

[33] Page Affidavit, ¶¶ 13-15, 17-18; Meringer Affidavit, ¶¶ 9-11.

[34] Page Affidavit, ¶¶ 7, 15; Meringer Affidavit, ¶ 10.

[35] Page Affidavit, ¶¶ 13-14; Exhibit 1-B; Meringer Affidavit, ¶ 9-10; see also the Meeting Agenda which identifies Jones Walker as Petaquilla's counsel, which is attached to the Merigner Affidavit as Exhibit 2-B.

[36] Page Affidavit, ¶¶ 13-14; Exhibit 1-B; Meringer Affidavit, ¶ 9-10; Exhibit 2-B.

Hunter.[37]   The Meeting Agenda was updated periodically and re-circulated to Petaquilla's representatives, including Richard Fifer, throughout the Transaction, and each version reflected Jones Walker as counsel for Petaquilla and Proskauer as counsel for Global Hunter.[38]

Thereafter, on March 10, 2012, Lucas C. Charleston, an associate at Proskauer, sent an email stating "Jones Walker will be serving as the Company's [Petaquilla's] US counsel and Proskauer Rose LLP will be serving as underwriters' US counsel."[39]   Richard Fifer, Joao Manuel, and Ezequiel Sirontinsky were copied on the email.[40]   No representative of Petaquilla ever responded to this email to indicate that Jones Walker was not U.S. counsel for Petaquilla.[41]

In addition, the Offering Memorandum, which was distributed to potential investors during the Transaction, states, under the section entitled "Legal Matters," that "certain legal matters relating to this offering will be passed upon for us [Petaquilla] by Jones, Walker, Waechter, Poitevant, Carrère & Denègre, L.L.P. [Jones Walker]."[42]   On September 29, 2012, Joao Manuel, Petaquilla's Chief Executive Officer, approved the Offering Memorandum on behalf of Petaquilla.[43]   Global Hunter was copied on Mr. Manuel's email approving the Offering

---

[37] Page Affidavit, ¶¶ 13-14; Exhibit 1-B; Meringer Affidavit, ¶ 9-10; Exhibit 2-B.

[38] Page Affidavit, ¶¶ 13-14; Exhibit 1-B; Meringer Affidavit, ¶ 9-10; Exhibit 2-B.

[39] Page Affidavit, ¶ 15; Exhibit 1-C.

[40] Page Affidavit, ¶ 15; Exhibit 1-C.

[41] Page Affidavit, ¶ 15.

[42] Page Affidavit, ¶ 17; see also the Senior Secured Notes which identifies Jones Walker as Petaquilla's counsel which is attached to the Page Affidavit as Exhibit 1-D; Meringer Affidavit, ¶ 10; see also the Senior Secured Notes which identifies Jones Walker as Petaquilla's counsel, which is also attached to the Meringer as Exhibit 2-C.

[43] Page Affidavit, ¶ 17; Exhibit 1-D; Meringer Affidavit, ¶ 10; Exhibit 2-C.

Memorandum.[44]  In the email, Mr. Manuel stated, "Please accept this as a sign off from the Company [Petaquilla].  Please follow up with JW [Jones Walker] for their sign off."[45]  If Jones Walker was not representing Petaquilla why would Petaquilla's Mr. Manuel ask Global Hunter's counsel to obtain a sign-off from it.  Once again, the foregoing facts establish that Petaquilla's assertions[46] do not add up and are just a desperate attempt to avoid having to move forward with the litigation.

### 8.    Petaquilla Breaches Its Contract With Jones Walker.

Jones Walker timely issued invoices to Petaquilla for legal services rendered in connection with the Transaction.[47]  Payment of Jones Walker's invoices was due upon receipt of each invoice.  Petaquilla did not pay any of Jones Walker's invoices for any of its legal services.[48]  To date, Jones Walker is owed a total of $516,198.51 on the unpaid invoices.[49]  Jones

---

[44] Meringer Affidavit, ¶ 10; Exhibit 2-C.

[45] Page Affidavit, ¶ 17; Exhibit 1-D; Meringer Affidavit, ¶ 10; Exhibit 2-C.

[46] Petaquilla's Motion to Stay points to Jones Walker's billing entries as "proof" that Global Hunter hired Jones Walker because it engaged in telephone conference calls with Global Hunter or revised and reviewed the Offering Memorandum and other associated documents. Petaquilla once again misses the mark.   These billing entries establish that during the Transaction, Jones Walker communicated with Global Hunter and its attorneys at Proskauer in order to prepare the Offering Memorandum and other documents for Petaquilla.  Jones Walker as counsel for Petaquilla worked on multiple drafts of the Offering Memorandum and other documents for Petaquilla.  During this time, Jones Walker naturally worked with Petaquilla's placement agent, Global Hunter, along with its attorneys at Proskauer, to prepare these documents, on behalf of Petaquilla.

[47] Page Affidavit, ¶ 19.

[48] Page Affidavit, ¶ 23.

[49] Page Affidavit, ¶ 24.

Walker attempted to contact Petaquilla on numerous occasions and requested that it pay its invoices, all to no avail.[50]

## III.    LAW AND ARGUMENT

### A.    Petaquilla is Not Entitled to a Mandatory Stay of the Litigation.

Petaquilla's Motion To Stay asks this Court to stay all the claims in this case until arbitration is completed between it and Global Hunter.[51]   Petaquilla is not entitled to a stay of the instant proceeding because Jones Walker is not a party to the arbitration agreement.   Specifically, the Federal Arbitration Act (the "FAA") does not require arbitration unless the parties to the dispute have agreed to refer it to arbitration. *AT&T Technologies v. Communication Workers*, 475 U.S. 643, 647-648, (1986).   Likewise, the mandatory stay provision of the FAA does not apply to those who are not contractually bound by the arbitration agreement.   *Id*.; *Coastal (Burmuda) Ltd., v. E. W. Saybolt & Co., Inc.*, 761 F.2d 198, 203 n. 6 (5th Cir. 1985); and, *Nederlandse Erts-Tankersmaatschappij v. Isbrandtsen Co., Inc.*, 339 F.2d 440, 441 (2d Cir. 1964).   Therefore, the FAA has no application to direct a party who was not a signatory to the arbitration agreement to arbitrate or to stay its lawsuit during arbitration. *In re Big Foot*, 887 F. 2d 611 (5th Cir. 1989).

---

[50] Page Affidavit, ¶¶ 21-22; See also email correspondence between employees of Jones Walker and Petaquilla requesting that Petaquilla pay its bills which are attached to the Page Affidavit as Exhibit 1-E and Exhibit 1-F respectively.

[51] While Petaquilla is attempting to have this case stayed while it participates in arbitration with Global Hunter, Petaquilla has filed suit against Global Hunter in the Southern District of New York, for issues arising out of and related to the Transaction.  Thus, Petaquilla's argument that this matter may effect the arbitration is inconsistent with its attempt to litigate its claims against Global Hunter.   A copy of the Complaints is attached hereto as **Exhibit 3**. Moreover, Petaquilla in its Complaint claims that Global Hunter was represented in the Transaction by Torys, LLP.  Nowhere in the Complaint does Petaquilla allege that Jones Walker represented Global Hunter.

Petaquilla, however, erroneously argues that the Supreme Court's decision in *Arthur Andersen LLP v. Carlisle*, permits a non-signatory to an arbitration agreement to invoke that arbitration agreement and stay the litigation pending the arbitration.  556 U.S. 624 (2009). Petaquilla fundamentally misapplies the *Carlisle* case.  In *Carlisle*, certain non-signatories to an arbitration agreement moved to stay litigation filed against them pursuant to section 3 of the FAA, 9 U.S.C. § 3.  556 U.S. 624 (2009). The district court denied the motions, and the United States Sixth Circuit dismissed an appeal from that denial for want of jurisdiction.  The Supreme Court, reversed and remanded, holding that "a litigant who was not a party to the relevant arbitration agreement may invoke section 3 if the relevant state contract law allows him to enforce the agreement."  This narrow holding has substantial implications to the facts before this Court.  Here, substantially different from *Carlisle*, Jones Walker, the non-signatory to the arbitration agreement, does not seek to invoke arbitration.  Inapposite the facts of *Carlisle*, Petaquilla, the signatory defendant is attempting to evoke section 3 of the FAA to force the non-signatory plaintiff, Jones Walker, to stay its litigation against Petaquilla pending arbitration of Petaquilla's separate dispute with Global Hunter.

In line with the Supreme Court in *Carlisle*, the Fifth Circuit has found **that a non-signatory may obtain a mandatory stay under section 3** if the following circumstances are present: "(1) the arbitrated and litigated disputes must involve the same operative facts; (2) the claims asserted in the arbitration and litigation must be 'inherently inseparable'; and (3) the litigation must have a 'critical impact' on the arbitration." *Waste Mgmt., Inc. v. Residuos Industriales Multiquam*, 372 F.3d 339, 343 (5th Cir. 2004).  The Fifth Circuit has applied this framework to allow a signatory plaintiff to invoke § 3's mandatory stay provision against a non-signatory defendant.

For example, in *Waste Management*, a signatory to an arbitration agreement filed a lawsuit seeking contract damages from a company that was a non-signatory to the agreement. 372 F.3d at 340. The signatory plaintiff was simultaneously engaged in arbitration with the parent company of the non-signatory defendant over the same contract damages at issue in the lawsuit. *Id.* at 340–41. The non-signatory defendant moved to stay the litigation pursuant to section 3 of the FAA.  Applying the three factors noted above, the court first found that the major operative facts underlying the signatory plaintiff's claims against the non-signatory defendant in the litigation were identical to those underlying the signatory plaintiff's claims in the arbitration. *Id*.  Second, the signatory plaintiff's claims in the arbitration and the litigation were inseparable because they sought to recover the same payment for a single alleged harm.  *Id*.  Third and finally, allowing the litigation to proceed would "substantially impact" the arbitration because the arbitrator would be reluctant to reach a decision contrary to the district court's determination. *Id*.  Based on the foregoing, the court found that a non-signatory defendant to an arbitration agreement may evoke the mandatory stay requirement of the FAA against a signatory plaintiff.

Significantly, *Waste Management* and the other cases relied on by Petaquilla in its Motion to Stay involve a signatory plaintiff to an arbitration agreement moving to stay the litigation proceeding pursuant to the FAA against a non-signatory defendant.  *Hill v. Gen. Elec. Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002)(finding that non-signatory defendant to an arbitration agreement may evoke the mandatory stay requirement of the FAA against a signatory plaintiff).  These cases are not applicable to the facts before the Court.  Here, the signatory defendant, Petaquilla, is seeking to stay the litigation brought by the non-signatory plaintiff, Jones Walker. The United States Third Circuit addressed a similar set of facts in *Mendez v. Puerto Rican International Companies, Inc.*, 553 F.3d 709 (3d Cir. 2009), holding that a

defendant signatory could not invoke section 3's mandatory stay provision against a non-signatory plaintiff. *Id.* at 711. In *Mendez*, forty-nine plaintiffs brought discrimination claims against their employer. *Id.* at 710. The employer moved to compel arbitration but could not show that all the plaintiffs had signed arbitration agreements covering the discrimination claims. The district court denied the motion to compel arbitration as to the non-signatory employees. *Id.* The employer then moved to stay the litigation of their claims pending the arbitration of the claims brought by the signatory plaintiffs. The Third Circuit held that the employer could not invoke § 3's mandatory stay provision against the non-signatories. *Id.* at 711. The court reasoned that the FAA "was not intended to mandate curtailment of the litigation rights of anyone who has not agreed to arbitrate any of the issues before the court." *Id.*

Both the text and purpose of the FAA support the Third Circuit's conclusion. *Vallejo v. Garda CL Southwest, Inc.,* Civ. No. 12-0555, 2013 WL 6190175 (S.D. Tex. 2013) (finding that a signatory to an arbitration agreement could not mandate a stay under the FAA against a non-signatory). Section 3's mandatory stay provision applies to "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. "Arbitration is a matter of contract; a party cannot be required to submit to arbitration unless it agreed in advance that the dispute would be arbitrated." *Vallejo,* 2013 WL 6190175 *6, citing Smith v. Transp. Workers Union of Am., AFL–CIO Air Transp. Local 556*, 374 F.3d 372, 374 (5th Cir. 2004).

Here, there is no doubt, Jones Walker did not sign any agreement with Petaquilla containing an arbitration clause. Petaquilla does not even claim that Jones Walker signed an arbitration agreement. Jones Walker's claims against Petaquilla are, therefore, not referable to arbitration. "The overarching purpose of the FAA, evident in the text of §§ 2, 3, and 4, is to ensure the enforcement of arbitration agreements according to their terms ...." *AT & T Mobility*

*LLC v. Concepcion*, ___U.S. ___, ___, 131 S.Ct. 1740, 1748,  (2011). The section 3 mandatory stay provision furthers this purpose by preventing a party from litigating a claim that it has agreed, or is otherwise bound, to arbitrate.  The section 3 mandatory stay typically arises when a plaintiff sues a defendant over a claim subject to the parties' arbitration agreement.  *Vallejo,* 2013 WL 6190175 *6; *See Mendez*, 553 F.3d at 712 ("Section 3 is drafted to fit the paradigm situation in which a motion for a stay pending arbitration occurs—a plaintiff brings suit on a claim involving an issue it is obligated to arbitrate under an agreement in writing with a defendant and that defendant seeks to stay the litigation pending arbitration.").  If the plaintiffs were able to litigate a claim that was subject to arbitration, "the arbitration proceedings would be both redundant and meaningless ... [and] thwart[ ] the federal policy in favor of arbitration." *Harvey v. Joyce*, 199 F.3d 70 (5th Cir. 2000).

The risk that litigation between a signatory and a non-signatory would undermine the signatory's agreement to arbitrate was central to the Fifth Circuit's decision in *Waste Management*.  In *Waste Management*, the signatory plaintiff sued the subsidiary company seeking the same contract damages it asserted against the parent company in arbitration. 372 F.3d at 345. A stay was necessary because arbitration with the parent company would have been meaningless had the **signatory plaintiff** first obtained relief in the litigation against the subsidiary.

By contrast, litigation between a **non-signatory plaintiff and a signatory defendant** does not undermine the defendant's right to arbitration when the plaintiff's claims are separate from the claims being arbitrated, even if the subject matter of the claims is similar. *Vallejo,* 2013 WL 6190175 at *6.  Furthermore allowing a signatory defendant to invoke the FAA's mandatory stay against a non-signatory plaintiff creates the possibility that the non-signatory plaintiff's

ability to assert its claims will be delayed "depending on the fortuity of whether there happens [sic] to be other parties ... [that] have agreed to arbitrate a different claim." *Vallejo,* 2013 WL 6190175 *6; *Mendez*, 553 F.3d at 712.

Even if the Court were to apply the *Waste Management* factors, Petaquilla is not entitled to a mandatory stay. Under the first *Waste Management* factor, the court examines whether the disputes being arbitrated and litigated involve the same operative facts. 372 F.3d at 343. Petaquilla states that the issues involved with the arbitration share the same facts that are at issue in Global Hunter's arbitration. Specifically, Petaquilla asserts that the major operative fact to be decided in the arbitration is whether Jones Walker's fees were included in the Engagement Letter. Moreover, Petaquilla contends that the arbitrator must decide the validity of Jones Walker's charges, and the reasonableness of Jones Walker's fees.

While all three parties participated in the Transaction, the operative facts involved in the arbitration are not the same as the facts at issue in this case. The arbitration concerns Global Hunter's relationship with Petaquilla, specifically the parties' Engagement Letter. Jones Walker was not a party to the Engagement Letter and is not bound by its terms. Moreover, the Engagement Letter was signed before Jones Walker was hired by Petaquilla. All of Global Hunter's claims in the arbitration arise out of and relate to the Engagement Letter, including whether Petaquilla must pay for Global Hunter's legal fees to Proskauer (not Jones Walker). Since Global Hunter was represented by Proskauer, Proskauer's fees are at issue in the arbitration. Jones Walker's fees are not. Since Jones Walker's fees are not covered by the Engagement Letter, the arbitrator will not determine the validity of Jones Walker's charges or whether they are reasonable. This inquiry is outside the scope of the Engagement Letter.

In comparison, this case concerns Jones Walker's relationship with Petaquilla and does not relate to the Engagement Letter. The terms of the Engagement Letter are clear that Petaquilla had a duty to hire its own legal counsel. Petaquilla did just that when it hired Jones Walker, and the parties entered into a contract separate and apart from the Engagement Letter. The agreement between Jones Walker and Petaquilla is what is at issue in this litigation. As a result, this case does not involve the same operative facts as the matter in arbitration, since Jones Walker was not a party to Petaquilla's Engagement Letter with Global Hunter just as Global Hunter was not a party to Jones Walker's agreement with Petaquilla. Accordingly, the first *Waste Management* factor weighs against the say.

The second *Waste Management* factor considers whether the claims asserted in the arbitration and litigation are inherently inseparable. 372 F.3d at 343. Petaquilla contends that the claims of Global Hunter and Jones Walker are inherently inseparable because the same evidence and defenses will be presented in the Global Hunter arbitration as in the litigation. Petaquilla's argument appears to conflate the first and second *Waste Management* factors. Claims are inherently inseparable when they involve "fundamentally ... one dispute." *Waste Mgmt.*, 372 F.3d at 345. In *Waste Management*, the signatory plaintiff sought relief in arbitration and litigation **for the same contract breach**. Jones Walker and Global Hunter are not seeking the same relief for the same claim. While both allege that Petaquilla failed to pay them for their services, Jones Walker does not seek any relief related to Global Hunter's fees, and Global Hunter is not seeking relief for Petaquilla's failure to pay Jones Walker's fees. Additionally, as established above, Jones Walker did not agree to arbitrate any of its claims with Petaquilla. The legal fees due Jones Walker will be resolved in this litigation an issue that cannot be resolved in

the Global Hunter-Petaquilla arbitration.  The claims are inherently separable.  Accordingly, the second *Waste Management* factor weighs against a stay.

Under the third *Waste Management* factor, the court examines the litigation's impact on the arbitration.  *Id*. at 343.  Petaquilla contends that the arbitration will "inevitably influence critically how the evidence is presented in the litigation."  The question is not whether or how arbitration will influence the litigation, but whether the litigation will adversely affect the parties' right to arbitrate.  *Waste Mgmt*., 372 F.3d at 343 ("The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration.").  Litigation of Jones Walker's claims does not undermine Petaquilla's ability to arbitrate with Global Hunter.  Moreover, courts have allowed non-arbitrable claims to continue to be tried in the court while the arbitrable claims are sent to arbitration.  *See Security Insurance Company of Hartford v. Trustmark Insurance Co. Ins.*, 283 F. Supp. 2d 612 (D. Ct. 2003).  In the *Security Insurance* case, the court allowed both actions to proceed simultaneously "absent compelling reasons to stay the litigation."  *Id.*  The Court may take into account the prejudice to the non-signatory party.  *Id.*  Accordingly, the third *Waste Management* factor weighs against a mandatory stay.

**B.    Petaquilla is Not Entitled to a Discretionary Stay of the Litigation.**

Alternatively, Petaquilla asks the court to exercise its discretion to stay the litigation of Jones Walker's claims pending its arbitration with Global Hunter. Even though section 3's mandatory stay does not apply, "a court may still exercise its discretion to stay litigation ... as a means of controlling and managing the docket." *Suzlon Infrastructure, Ltd. v. Pulk*, 2010 WL 3540951, at *4 (S.D. Tex. 2010).  When determining whether to grant a discretionary stay, courts

apply the *Waste Management* factors.   As discussed above, under the *Waste Management* factors, Petaquilla is not entitled to a stay, discretionary or otherwise.

Petaquilla's Motion to Stay relies on *Mosaic Underwriting Serv., Inc. v. Moncla Marine Operations, L.L.C*., 2013 WL 1556141 (E.D. La. 2013), for the proposition that the Court should grant a discretionary stay.   In *Mosaic*, the defendant, Moncla, sought to stay plaintiff, Mosaic's, claims while it participated in arbitration with several third-party insurers.   Moncla had numerous insurance policies insuring a vessel it owned, several of which contained arbitration clauses.   After the vessel sank, Mosaic filed suit against Moncla seeking a declaratory judgment that the damage to the vessel was not covered under the policy it issued to Moncla.   *Id*.   In response, Moncla filed a counterclaim against Mosaic and a third-party demand against three other insurers, asserting that Mosaic and the third-party insurers had conspired to compensate it under the wrong policy of insurance.   Thus, Moncla's claims against Mosaic were identical to its claims against the third-party insurers.   While the policy that Mosaic issued to Moncla did not contain an arbitration clause, the policies issued by the third-party insurers did.   As a result, the third-party insurers filed motions to compel arbitration and stay the court proceedings, which the court granted.   *Id*.

Thereafter, Moncla filed a motion seeking to stay Mosaic's suit.   The court used its discretion and stayed Mosaic's suit because the litigation could have a critical impact on the arbitration.   *Id*.   Since Moncla's claims against the third-party insurers were identical to its claims against Mosaic, the court stated that the arbitrator may be influenced by the court's determination.   Specifically, if the court determined that Mosaic did not conspire with the third-party insurers to compensate Moncla under the wrong policy of insurance, the arbitrator may be

influenced to determine that the third-party insurers also did not conspire to compensate Moncla under the wrong policy.

The decision by the Court in this suit will not have a critical impact on the arbitration. Unlike the defendant in *Mosaic*, Petaquilla has not brought any claims against Global Hunter and the deadline for filing such a complaint has passed.[52]  Thus, there is no risk that the arbitrator will be influenced to follow this Court, because the arbitrator is determining a completely different issue; whether Petaquilla breached its contract with Global Hunter.  Here, the Court will decide whether Petaquilla breached its contract with Jones Walker.  As a result, the court may determine the merits of Jones Walker's claims without influencing the outcome of the arbitration.

Finally, Petaquilla's request for a stay should be denied because it is simply another attempt to delay paying Jones Walker's legal fees.  This case has been pending for over a year and, during that time, Petaquilla has been actively involved in the lawsuit, by filing an answer, engaging in pre-trial discovery,[53] filing a motion to dismiss, participating in scheduling conferences, and ultimately preparing for trial.  These actions demonstrate Petaquilla's Motion to Stay is a last ditch effort to further delay this proceeding.

Interestingly, Petaquilla did not assert that this matter should be stayed until almost a year after this litigation had been pending.  Indeed, Petaquilla knew about the arbitration provision as it stated in its Motion to Dismiss that the Engagement Letter between it and Global Hunter contained an arbitration provision.  At that time, however, Petaquilla did not request a stay.

---

[52] Rec. Doc. 18 and Rec. Doc. 33. Rec. Doc. 18 provides that the last day to file amendments to pleadings, third-party actions, cross-claims and counter-claims was November 20, 2014.  This date has long since passed.

[53] For Example, Jones Walker will be taking the corporate deposition of Petaquilla in New York in July.

Instead, Petaquilla waited until after Global Hunter filed its arbitration demand to request a stay in this matter.  If Petaquilla truly believed that Jones Walker's fees were included in the Engagement Letter, it would have filed a third-party complaint against Global Hunter or initiated arbitration against Global Hunter and asked for this matter to be stayed at that time.  Instead, it willfully allowed the time to amend pleadings or add a third party demand to lapse and continued to move forward with this litigation.  As a result, Petaquilla effectively has waived its right to a request a stay since it has participated in this litigation for over a year.[54]

Finally, staying the litigation at this juncture will severely prejudice Jones Walker. Specifically, it will decrease the probability that Jones Walker can collect on any judgment it may receive against Petaquilla.  It is no secret that Petaquilla has been struggling financially.  For example, in January 2015, Petaquilla signed an investment trust to help the company finalize its financial statements and move towards compliance with regulatory requirements.[55]  Thereafter, in February 2015, it was delisted from the Toronto Stock Exchange.[56]  These public announcements indicate that Petaquilla's financial situation is precarious.  There is no guarantee that Petaquilla's financial situation will improve, and, if this matter is stayed and Jones Walker is forced to wait on a lengthy arbitration, Petaquilla's financial situation may further deteriorate. Given the above facts and, in the interests of justice, this Court should allow this matter to

---

[54] It is well established in the Fifth Circuit, that a party may waive its right to request that a matter be submitted to arbitration.  See *In re Mirant Corp., 613 F.3d 584* (5th Cir. 2010). Similarly, a party may waive its right to request a stay.

[55] Market Wired, *Petaquilla Minerals Ltd. Signs US $25M Facility*, http://www.marketwired.com/press-release/petaquilla-minerals-ltd-signs-us25m-facility-tsx-ptq-1983792.htm (last visited June 9, 2015).

[56] *See* News Wire, TSX Delisting Review-Petaquilla Minerals Ltd, http://www.newswire.ca/en/story/1480507/tsx-delisting-review-petaquilla-minerals-ltd-symbols-ptq (last visited June 9, 2015).

proceed to allow Jones Walker a fair opportunity to collect any judgment that it may receive against Petaquilla.

## IV.    CONCLUSION

For the foregoing reasons, Petaquilla's Motion to Stay Pending Arbitration should be denied because, under the FAA, it is not entitled to a mandatory stay.  Moreover, Petaquilla is not entitled to a discretionary stay because it has not established that this matter in anyway is related to its arbitration with Global Hunter.  As a result, this Court should deny Petaquilla's Motion to Stay.

Respectfully submitted,

*/s/ Laura F. Ashley*
H. MARK ADAMS (#2318) (T.A.)
LAURA F. ASHLEY (#32820)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, LA  70170-5100
Telephone: (504) 582-8118
Facsimile: (504) 589-8118
*Attorneys for Jones Walker LLP*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed and served on counsel on June 9, 2015, by electronic filing through the Court's CM/ECF system.

*/s/ Laura F. Ashley*
LAURA F. ASHLEY, Bar No. 32820